UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TANYA M. PICCA,                    :
                                   :
          Plaintiff                :     No. 1:11-CV-02117
                                   :
     vs.                           :     (Judge Caldwell)
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
          Defendant                :

FILED
HARRISBURG, PA

MAY 1 3 2013

MARY E. D'ANDREA, CLERK
Per _____
              Deputy Clerk

## MEMORANDUM

### BACKGROUND

 The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Tanya M. Picca's claim for social security
disability insurance benefits and supplemental security income
benefits.

 Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured." It is
undisputed that Picca met the insured status requirements of the
Social Security Act through March 31, 2010. Tr. 9 and 11.[1] In
order to establish entitlement to disability insurance benefits
Picca was required to establish that she suffered from a

_____

1. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on January
13, 2012.

disability on or before that date.  42 U.S.C. § 423(a)(1)(A),

(c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926

F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income

supplement program funded by general tax revenues (not social

security taxes).  It is designed to help aged, blind or other

disabled individuals who have little or no income. Insured status

is irrelevant in determining a claimant's eligibility for

supplemental security income benefits.

On January 14, 2010, Picca filed protectively[2]

applications for disability insurance benefits and supplemental

security income benefits. Tr. 9, 59-60, 139, 142-148 and 176.  On

June 4, 2010, the Bureau of Disability Determination[3] denied

Picca's applications. Tr. 68-76.  On July 30, 2010, Picca

requested a hearing before an administrative law judge. Tr. 77-78.

After about 11 months had passed, a hearing was held on June 29,

2011. Tr. 9 and 18-58.  On July 1, 2011, the administrative law

judge issued a decision denying Picca's applications. Tr. 9-17.

---

2.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

3.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits and supplemental security income benefits on
behalf of the Social Security Administration.  Tr. 68 and 72.

On July 13, 2011, Picca requested that the Appeals
Council review the administrative law judge's decision and on
September 23, 2011, the Appeals Council concluded that there was
no basis upon which to grant Picca's request for review. Tr. 1-5
and 136-138.  Thus, the administrative law judge's decision stood
as the final decision of the Commissioner.

Picca then filed a complaint in this court on November
14, 2011.  Supporting and opposing briefs were submitted and the
appeal[4] became ripe for disposition on May 18, 2012, when Picca
filed a reply brief.

Picca was born on March 20, 1962, in Sri Lanka (Ceylon),
and at all times relevant to this matter was considered a "younger
individual"[5] whose age would not seriously impact her ability to
adjust to other work. 20 C.F.R. §§ 404.1563© and 416.963©. Tr. 87,
128, 160 and 242.  Although Picca in her brief indicates that she
is a United States citizen, the administrative record indicates
otherwise. Tr. 151-150; Doc. 10, Plaintiff's Brief, p. 1.  One
record indicates that she is a citizen of the United Kingdom and a
second document a lawful permanent resident of the United States

---

4.  Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

5.  The Social Security regulations state that "[t]he term
younger individual is used to denote an individual 18 through
49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

who entered this country on October 4, 1970, when she was 8 years old. Tr. 140 and 157.

After entering the United States, Picca graduated from high school in 1981. Tr. 21 and 182. Picca can read, write, speak and understand the English language and perform basic mathematical functions such as counting change, handling a savings account and using a checkbook and money orders. Tr. 21, 180, 182 and 193. During her elementary and secondary schooling, Picca attended regular education classes. Tr. 182. After graduating from high school, Picca attended college for one year (1981-1982). Tr. 21. Picca also received computer training by attending seminars and certifications classes offered by her employers. Tr. 182.

Picca has past relevant employment[6] as a sales representative and an audit clerk which were both described by a vocational expert as skilled, light work.[7] Tr. 47.

---

6. Past relevant employment in the present case means work performed by Picca during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. The terms sedentary and light work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(continued...)

Picca testified that she worked as a mystery shopper. Tr. 22-26. The vocational expert indicated that the Dictionary of Occupational Titles describes that position as semi-skilled, light work but because Picca reported that she was engaging in auditing type activities that the position had to be characterized as skilled work. Tr. 47.

Picca's work history covers a period of more than 30 years. Tr. 159 and 200. Records of the Social Security Administration reveal that Picca had earnings in the years 1978 through 2002 and 2004 through 2010. Tr. 159. Picca's highest annual earnings were in 1999($22,988.96). Id. Picca's total reported earnings were $342,189.00. Id. Before 1981 Picca's highest annual earnings were $1689.45 and after 2002 $3837.00. Under the regulations of the Social Security Administration,

---

7.  (...continued)
        (b) *Light work.* Light work involves lifting no more
        than 20 pounds at a time with frequent lifting or
        carrying of objects weighing up to 10 pounds. Even
        though the weight lifted may be very little, a job is
        in this category when it requires a good deal of
        walking or standing, or when it involves sitting most
        of the time with some pushing and pulling of arm or leg
        controls. To be considered capable of performing a
        full or wide range of light work, you must have the
        ability to do substantially all of these activities.
        If someone can do light work, we determine that he or
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567 and 416.967.

Picca's work and earnings did not amount to substantial gainful activity in 1978 through 1980 and after 2002.[8]

In a document filed with the Social Security Administration Picca stated that she performed work as a commercial sales representative for OfficeMax, Inc., from March, 1997 to June 2001; as an account executive for Applause, LLC, and The Boyd's Bear Collection, Ltd., from June 2001 to September, 2002; as a mystery shopper performing audits from June, 2003 to February, 2010; and as a data collector for Crossmark from October 2009 to January, 2010. Tr. 200. At the administrative hearing, Picca testified that she was still working part-time as a mystery shopper on an independent contractor basis for several companies and that her latest assignment was the weekend before the hearing at a movie theater in Gettysburg, Pennsylvania. Tr. 22-25.

Picca claims that she became disabled on November 2, 2007, because of rheumatoid arthritis and bursitis of the left shoulder. Tr.12, 35, 68, 72 and 181. Picca contends she has debilitating pain in the joints of the ankles, knees and left

---

8. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity. The official website of the Social Security Administration reveals that in 1978 the amount was $260 per month ($3120 per year); in 1979 the amount was $280 per month ($3360 per year); in 1980 through 1989 the amount was $300 per month ($3600 per year); in 1990 through 1998 the amount was $500 per month ($6000 per year); in 1999 and 2000 the amount was $700 per month ($8400 per year); in 2001 the amount was $740 per month ($8880 per year); and in 2002 the amount was $780 per month ($9360 per year). Substantial Gainful Activity, http://www. ssa.gov/oact/cola/sga.html (Last accessed May 10, 2013).

shoulder and down her left arm.[9] Tr. 31-40 and 197. She claims
that "walking [and] standing for any duration of time can be very
difficult." Tr. 197. She further contends that she cannot sit
for more than 30-45 minutes and that her joints swell. Id.

In a "Function Report - Adult" dated March 28, 2010,
Picca indicated that she performed a range of daily activities.
Tr. 190-196. Picca lives with her father and youngest daughter.
Tr. 29 and 190. Picca stated that she has no problem with
personal care, such as dressing, bathing and caring for her hair,
other than when she has an arthritic flare-up. Tr. 191. The last
flare-up reported was in January, 2010. Tr. 34. In addition, she
prepares simple meals daily, performs cleaning, laundry and mowing
the yard although when she has a painful day "a family member"
will "help mow the lawn." Tr. 192. Picca goes out daily "on warm
days" and takes her daughter to the pool and playground for
exercise. Tr. 39 and 193. Picca visits the library and shops for
groceries, school supplies, clothing, toys and household items.
Id. Picca stated that she cares for her daughter who attends
public school and is in the second grade, including bathing,
feeding, fixing her hair and dressing her and going over her
homework. Tr. 38 and 190. Picca stated that her hobbies are
reading, games, puzzles, movies and walking but noted that she
"cannot walk easily due to pain as a result of swollen joints in
my arm, legs [and] ankles." Tr. 194. In the "Function Report,"

_____

9. Picca is right-handed. Tr. 195.

Picca when asked to check items which her "illnesses, injuries, or conditions affect" did <u>not</u> check talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands and getting along with others. Tr. 195. Picca does not use an assistive device such as a cane or walker. Tr. 196.

The record further reveals that Picca traveled from Pennsylvania to New England in August, 2010 and to Walt Disney World in October, 2009. Tr. 44. Picca testified that she was able to cope with these trips by taking additional medications prescribed by her doctor. Tr. 44-45.

For the reasons set forth below we will affirm the decision of the Commissioner.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34,

38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work

10

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation

(continued...)

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

---

11. (...continued)
process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records although many of them are handwritten and barely legible. Furthermore, we are unable to discern the names of the treating physicians on many of the records.

On March 26, 2008, Picca received treatment at Pinnacle Health Hospitals ("Pinnacle"). Tr. 267. The record does not specify which facility. Id. The record of this appointment indicates that Picca was "seen here 2 y[ears] ago [with] morning stiffness and subcutaneous nodules and was [diagnosed] with

13

[rheumatoid arthritis]." Id.  At this appointment Picca complained of ankle swelling, left greater than the right, right elbow swelling and "small nodules in the right palm." Id.  When the treating medical provider reviewed Picca's systems,[14] Picca reported having no fevers, chills or morning stiffness. Id.  The results of a physical examination were essentially normal other than her blood pressure was elevated, she had a rapid pulse and she had bilateral ankle swelling and tenderness, left greater than right. Id.  However x-rays of Picca's shoulder, wrists, hands, feet and ankles were unremarkable except for calcaneal spurring in her feet.[15] Id.  The treating medical providers assessment was "rheumatoid arthritis, mild episodic." Id.  The medical notes of this appointment suggest that several medications were no longer needed, including the rheumatoid arthritis medication methotrexate.[16] Id.

Three months later, on June 25, 2008, Picca returned to Pinnacle complaining of intermittent joint pain and stiffness. Tr.

---

14.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed May 11, 2013).

15.  A calcaneal spur is a bone spur located on the heel bone.

16.  In the treatment note there is a list of medications and next to that list is the following statement: "not needed."

264. Picca acknowledged that the pain and stiffness was controlled with prednisone. Id. A physical examination revealed that Picca's ankles were swollen and painful but she had normal reflexes and motor strength. Id. The assessment was that Picca suffered from rheumatoid arthritis and the plan was to taper down the prednisone[17] and than discuss other options, including a prescription for methotrexate. Tr. 255.

On August 7, 2008, Picca had an appointment at Devonshire Family Health Center ("Devonshire") because of sore, painful and misshapen ankles. Tr. 234. A physical examination revealed that Picca's ankles were swollen and tender and she had "flat arches." Id. Picca's current medications were prednisone 5 mg a day and methotrexate 5 mg, three time per week. Id. The assessment was that Picca suffered from rheumatoid arthritis of the ankles which were becoming symptomatic. Id. Picca was given a prescription for Celebrex and two sample boxes of Voltaren gel to apply to the ankles four times per day. Id. Picca was directed to follow-up as needed. Id.

---

17. "Prednisone is in a class of drugs called corticosteroids. Prednisone prevents the release of substances in the body that cause inflammation. Prednisone is used to treat many different conditions such as allergic disorders, skin conditions, . . . arthritis . . . ." Prednisone, Drugs.com, http://www.drugs.com /prednisone.html (Last accessed May 11, 2013). A taper is a gradual reduction in dosage. Id. There are withdrawal symptoms if prednisone is discontinued abruptly. Id.

On September 24, 2008, Picca had a follow-up appointment regarding her arthritis at Pinnacle (Kline Health Center) at which she stated that since the last visit "she has [had] more good days then bad days." Tr. 260. She also stated that her morning stiffness had improved and that she felt energetic. Id. Picca did report pain in her right arm but that two days prior to the appointment she had moved furniture. Id. A physical examination revealed mild swelling of the left ankle with tenderness but without redness and limited range of motion of the right shoulder. Id. Recent blood test also revealed that Picca was anemic which was attributed to heavy menstrual blood loss. Id. Also, Picca's blood pressure was elevated (136/98) which the treating medical provider suspected was secondary to taking prednisone. Id.

On December 23, 2008, Picca had an appointment at Devonshire at which she complained of left shoulder pain and swollen fingers which started three days prior to the appointment. Tr. 232. She also complained of being unable to get dressed. Id. The objective findings were in toto as follows: "On exam, there is tenderness of the left deltoid bursa on palpation, anterior, superior and posterior areas are minimally tender and underneath the arm it is not tender at all." Id. The assessment was that Picca suffered from left deltoid bursitis and was given an

injection of Kenalog, a corticosteroid, into the painful area. Id.
Picca was directed to follow-up as needed. Id.

On January 2, 2009, Picca was referred by Devonshire to
Pinnacle for physical therapy.  Tr. 232.

Picca had an initial physical therapy evaluation at
Pinnacle on February 12, 2009. Tr. 284-286.  The report of this
evaluation indicates that Picca was working as an Avon sales
person and also as an independent contractor for auditing movie
theaters. Tr. 284.  A physical examination revealed that Picca
ambulated independently without an assistive device. Tr. 285. Her
gait was characterized by "mild guarding of the left upper
extremity." Id.  Her range of motion was normal except for the
left shoulder and movement of the left shoulder was painful. Id.
Picca had normal motor strength (5/5) except for the left shoulder
which was reduced to 4/5. Id.  Sensation in the bilateral upper
extremities was intact. Id.  The Hawkin's Test, a test for
shoulder impingement, was negative. Id.  The Dawbarn's Test, a
test for bursitis, was negative. Id.  Picca was scheduled for
physical therapy 3 times per week for 4 weeks. Id.

On February 23, 2009, Picca told the physical therapist
that her "shoulder doesn't feel too bad." Tr. 279.  Four days
later, Picca reported no pain, stating,"[m]y shoulder feels pretty
good." Id.

17

On February 25, 2009, Picca had an appointment at Pinnacle (Kline Health Center) at which she reported that "she [was] feeling good ... much better, no joint[] pain, but still . . . some joint stiffness[.]" Tr. 258. The treatment note appears to indicate that Picca reported that the morning stiffness lasted less than 5 minutes. Id.

On March 2, 2009, Picca told the physical therapist that she felt no pain and specifically stated "I'm really feeling much better." Tr. 279. She continued to feel no pain on March 6 and 9, 2009, and on March 13, that she was feeling "really great.". Id. At the time of discharge from the physical therapy program on March 25, 2009, Picca had 4/5 strength in the left upper extremity with respect to abduction[18] and all other strength testing was noted to be normal (5/5). Tr. 278 and 282-283. It was also observed that Picca had some limited range of motion in her shoulder but Picca reported no pain and stated, "I feel great." Id. Furthermore, at the time of discharge from the physical therapy program Picca had no guarding of the left upper extremity. Id.

Five months later, on August 26, 2009, Picca had an appointment at Pinnacle (Kline Health Center) at which she

_____

18. Abduction is movement of a body part away from the midline of the body.

complained of ankle pain which was worse when walking down stairs but was relieved with medication. Tr. 256. Picca reported that she had no joint swelling. Id. Her anemia had improved and she had no fatigue or headaches. Id. When the treating medical provider reviewed Picca's systems, all systems were reported to be fine, including her musculoskeletal system. Id. A physical examination revealed full range of motion of the ankle and no pain with movement but some redness of the ankle without warmth or swelling. Id.

On December 10,2009, Picca had an appointment at Pinnacle (Kline Health Center) at which she complained of morning stiffness of her ankles which lasted 30 minutes. Tr. 254. A review of systems by the medical provider was completely negative. Id. A physical examination revealed stiffness in both ankles and irritation in the left shoulder joint but normal strength and range of motion throughout. Id.

On December 21, 2009, Picca had an appointment at Devonshire regarding a breast abscess. Tr. 229. It was noted that Picca had "no other complaints." Id. A physical examination was normal other than with respect to the abscess. Id.

On February 4, 2010, Picca had an appointment at Pinnacle (Kline Health Center) regarding pain in her ankles and insomnia. Tr. 251. A review of Picca's systems was negative

except for bilateral ankle pain. Id. Picca reported no pain in
the fingers or wrists and no severe flare-ups since January, 2010.
Id. The results of a physical examination were essentially normal
except for mild bilateral ankle swelling and decreased left
shoulder range of motion. Id. Picca had normal grip strength. Id.
The assessment was that Picca suffered from rheumatoid arthritis
which was stable on methotrexate and "on/off" left shoulder pain.
Tr. 252

About 5 months later, Picca on June 16, 2010, had a
follow-up appointment at Pinnacle (Kline Health Center) regarding
her rheumatoid arthritis. Tr. 328-329. It was noted that Picca's
left shoulder remained stable with "some discomfort." Id. A
review of Picca's systems was completely negative. Id. The
results of a physical examination were essentially normal except
it was observed she had tensynovitis[19] of the ankle, left shoulder
tenderness, and limited range of motion in the left shoulder. Id.
A few months later, on September 22, 2010, the Pinnacle staff
again noted Picca's left shoulder pain and decreased range of
motion. Tr. 326. They also observed that Picca's ankles were warm
and palpation elicited pain. Id.

_____

19. "Tenosynovitis is inflammatoin of the lining of the sheath
that surrounds a tendon (the cord that joins muscle to bone)."
Tenosynovitis, MedlinePlus, U.S. National Library of Medicine,
http://www.nlm.nih.gov/medlineplus/ency/article/001242.htm
(Last accessed May 11, 2013).

On October 21, 2010, it appears that Picca visited Devonshire complaining of ongoing pain and other symptoms in her left shoulder. The note of this apparent appointment does not contain any objective findings or an assessment by the treating medical provider. Tr. 309.

Six months later, on April 27, 2011, Picca had a follow-up appointment at Pinnacle (Kline Health Center) regarding pain and swelling in her right ankle which she described as "on/off." Tr. 324-325. However, the objective portion of the report of this appointment contains no adverse physical examination findings. Tr. 324. The treating medical provider noted that Picca'a rheumatoid arthritis was "well controlled." Tr. 325.

On May 20, 2010, Picca was examined by Christine Daecher, D.O., on behalf of the Bureau of Disability Determination. Tr. 288-296. Dr. Daecher found that Picca could lift/carry 2-3 pounds frequently and 25 pounds occasionally; stand and walk 2 to 3 hour in an 8-hour workday; sit 8 hours with alternating sitting and standing at her option; and no limitations in pushing and pulling other that with respect to the lower extremities which was limited to occasional. Tr. 293. Picca could occasionally perform postural activities such as bending, kneeling and stooping. Tr. 292. Picca was limited to occasional reaching with the left upper extremity and occasional handling and

fingering if she suffered a flare-up of arthritis. Id.  Picca was
also limited with respect to exposure to cold temperatures. Id.

**DISCUSSION**

The administrative law judge at step one of the
sequential evaluation process found that Picca had not engaged in
substantial gainful activity since November 2, 2007,  the alleged
disability onset date. Tr. 11.

At step two, the administrative law judge found that
Picca suffers from the following severe impairments: rheumatoid
arthritis and bursitis. Tr. 12.

At step three of the sequential evaluation process the
administrative law judge found that Picca's impairments did not
individually or in combination meet or equal a listed impairment.
Id.

In addressing step four of the sequential evaluation
process in his decision, the administrative law judge found that
Picca could not perform her past relevant light work but that she
could perform a limited range of other skilled, light work. Tr.
12-15.  Specifically, the administrative law judge found that
Picca could perform light work

> except the claimant can lift/carry less than 10 pounds
> with her left upper extremity; can stand/walk for only
> three hours during an eight-hour workday; and must
> alternate between sitting and standing at least three
> times per hour.  The claimant can only occasionally
> reach with her left upper extremity, bend, kneel,

stoop, crouch, crawl, climb, and handle/finger with
her left hand. The claimant must avoid unprotected
heights, temperature extremes, and vibrations.

Tr. 12. In arriving at this residual functional capacity the
administrative law judge found that Picca's statements about her
pain and functional limitations were not credible. Tr. 13. In
additional the administrative law judge placed substantial weight
on the opinion of Dr. Daecher. Tr. 14.

At step five, the administrative law judge based on the
above residual functional capacity and the testimony of a
vocational expert found that Picca had the ability to perform work
such as an audit clerk and that there were a significant number of
such jobs in the local and state economies. Tr. 16.

The administrative record in this case is 349 pages in
length and we have thoroughly reviewed that record. The
administrative law judge did an adequate job of reviewing Picca's
medical history and vocational background in his decision. Tr. 9-
17. Furthermore, the brief submitted by the Commissioner also
adequately reviews the medical and vocational evidence in this
case. Doc. 13, Brief of Defendant.

Picca argues that the administrative law judge erred at
step 3 of the sequential evaluation process in failing to find
that Picca met Listings 14.09A and 14.09D. We find no merit in
Picca's arguments.

23

Picca cannot satisfy the criteria of Listing 14.09A. Specifically, it requires Picca to prove that she sustained persistent inflammation or deformity of: (1) one or more major peripheral weight bearing joints that result in an inability to ambulate effectively; or (2) one or more major peripheral joints in each arm that resulted in an inability to perform fine and gross movements effectively. See 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09A.

The regulations define the phrase "inability to ambulate effectively" as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at § 14.00C6(citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00B2b(1)). Examples of an "inability to ambulate effectively" include needing a walker, crutches, or two canes to walk; not being able to walk a block at a reasonable pace on rough or uneven surfaces; an inability to use public transportation; or being unable to carry out routine ambulatory activities(i.e., shopping, banking, or climbing a few steps at a reasonable pace with the use of a single handrail). Id. (citing id. at (2)).

The regulations define the phrase "inability to perform fine and gross motor movements effectively" as "an extreme loss of

function of both arms; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.00C7 (citing 20 C.F.R. pt. 404, subpt. P. App. 1 § 1.00B2c). Examples of such an inability include not being able to prepare a simple meal or feed oneself, an inability to care for personal hygiene, an inability to sort and handle paper or files, or being unable to place files in a cabinet at or above waist level. Id.

Picca has proffered no medical opinion, nor has she marshaled the evidence in the record, to support her contention that her condition met or equaled the requirements of Listing 14.09A. The record is devoid of evidence that she needed an assistive device to walk; she continued to work part-time; she went on family vacations; and she took her daughter to the playground and pool. Tr. 39. Health care personnel never noted an inability to walk effectively or independently. Picca acknowledged that she could use her hands. Tr. 192 and 195. Picca was able to bathe, dress and prepare meals for her daughter. She could perform household chores and even mow the lawn at times. Furthermore, she was able to work as a mystery shopper and prepare audit reports. This position required her to visit retail establishments, check and use email, engage in typing and the

handling of small objects. Tr. 23 and 204-205. Also, it was observed by healthcare personnel that Picca had normal grip strength. We cannot conclude based on the review of the bare medical records that Picca met Listing 14.09A.

Picca also has failed to prove that she met Listing 14.09D which requires repeated manifestations of inflammatory arthritis with at least two of the constitutional signs or symptoms (severe fatigue, fever, malaise, or involuntary weight loss) and a marked limitations in one of the following areas: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace. 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09D. The medical records do not establish the presence of two of the constitutional signs or symptoms for the requisite 12 month statutory period. In fact Picca reported to healthcare personnel that she felt good or better, that she was energetic, and that she had more good days than bad days. Furthermore, no treating physician indicated that Picca had a marked limitation in activities of daily living, maintaining social functioning or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace.

The Social Security regulations require that an applicant for disability benefits come forward with medical

evidence "showing that [the applicant] has an impairment(s) and
how severe it is during the time [the applicant] say[s] [he or she
is] disabled" and "showing how [the] impairment(s) affects [the
applicant's] functioning during the time [the applicant] say[s]
[he or she is] disabled." 20 C.F.R. §§ 404.1512© and 416.912©.
Picca failed to provide such evidence.

No treating or examining physician has indicated that
Picca suffered from physical functional limitations that would
preclude her from engaging in the limited range of light work set
by the administrative law judge in his decision for the requisite
statutory 12 month period.[20]

The administrative law judge relied on the opinion of
Dr. Daecher, a state agency physician who examined Picca. The
administrative law judge's reliance on that opinion was
appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d.
356, 362 (3d Cir. 2011)("Having found that the [state agency
physician's] report was properly considered by the ALJ, we readily
conclude that the ALJ's decision was supported by substantial

---

20.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

evidence[.]"); see also Social Security Program Operation Manual System (POMS) Section DI 24515.013, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515013 (Last accessed May 11, 2013) ("The signature of a State agency medical . . . consultant on [specified forms] ensures that consideration by a physician . . . has been given to the question of medical equivalence . . . Other documents, including the Psychiatric Review Technique form . . . and various other documents on which medical . . . consultants may record their findings, may also ensure that this opinion has been obtained . . . When an administrative law judge . . . finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record is satisfied by any of the foregoing documents signed by a State agency medical . . . consultant."). The forms completed by Dr. Daecher on May 20, 2010, are sufficient evidence that Picca failed to meet the requirements of any listed impairment. Tr. 288-296.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.

We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: May _13_, 2013

29

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TANYA M. PICCA,                    :
                                   :
          Plaintiff                :      No. 1:11-CV-02117
                                   :
     vs.                           :      (Judge Caldwell)
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
          Defendant                :

## ORDER

In accordance with the accompanying memorandum, **IT IS
HEREBY ORDERED THAT:**

1.   The Clerk of Court shall enter judgment in favor of
the Commissioner and against Tanya M. Picca as set forth in the
following paragraph.

2.   The decision of the Commissioner of Social Security
denying Tanya M. Picca disability insurance benefits and
supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.

William W Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: May __13__, 2013

FILED
HARRISBURG, PA

MAY 1 3 2013

MARY E. D'ANDREA, CLERK
Per _____
     Deputy Clerk